UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-80507-CIV-MARRA/MATTHEWMAN

BRANCH BANKING AND TRUST COMPANY,

        Plaintiff,

vs.

HAMILTON GREENS, LLC, DEVCON
LIVINGSTON GREENS, LLC, BLG
ENTERPRISES, LLC, RICHARD BELLINGER,
individually, CHAD LABONTE, individually, and
ROLAND LABONTE, individually,

        Defendants,

and

MAUREEN DONNELY, individually,

        Defendant in Proceedings
        Supplementary.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON BRANCH BANKING AND TRUST COMPANY'S COMPLAINT IN PROCEEDINGS SUPPLEMENTARY [DE 293]

**THIS CAUSE** came before the Court for evidentiary hearings, held on September 28 and October 7, 2015, on BB&T's Complaint in Proceedings Supplementary [DE 293] instituted pursuant to Federal Rule of Civil Procedure 69(a) and section 56.29, Florida Statutes. This matter was referred to the undersigned by the Honorable United States District Judge Kenneth A. Marra. *See* DE 278. The undersigned having received documentary and testimonial evidence, having heard arguments of counsel, having considered the demeanor and credibility of the

witnesses, and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law, and **RECOMMENDS** that the Honorable United States District Judge Kenneth A. Marra **GRANT IN PART AND DENY IN PART** the Complaint in Proceedings Supplementary [DE 293].

## I.   PROCEDURAL BACKGROUND

Plaintiff, Branch Bank & Trust Company ("BB&T") filed a claim for breach of contract against various defendants [DE 1] and obtained a Final Judgment [DE 211] in the amount of $4,923,797.57 ("Judgment") against Defendant Richard Bellinger ("Bellinger") on May 28, 2013.[1]

On August 5, 2013, BB&T attempted to hold Bellinger in contempt of court for not complying with this Court's Final Judgment. *See* DE 216. In that proceeding, BB&T attempted to argue that the creation of Bellinger's trust in the Cook Islands ("Trust") was a fraudulent transfer designed to avoid payment of the Judgment. [DE 240, p. 6]. The undersigned found that BB&T did not present sufficient evidence to establish that Bellinger should be held in contempt of court for failing to pay the Judgment entered against him. *Id.* at 8. However, this Court "did not make a finding as to whether the creation of the Cook Islands Trust *amounted* to a fraudulent conveyance; rather, the undersigned limited its holding to the discrete issue of whether Mr. Bellinger should be held in contempt of court." [DE 292, p. 2].

Then, pursuant to section 56.29, Florida Statutes, and Federal Rule of Civil Procedure 69(a), BB&T sought to commence proceedings supplementary to and in aid of execution and to implead a third party, Maureen Donnelly ("Donnelly"), who allegedly received assets that may have been used to satisfy BB&T's Judgment. *See* DE 283. Pursuant to Rule 69(a)(1),

---

[1] This amount was partially satisfied by payments from certain of the defendants of $2,000,314.90; $386,183.00; and $20,370.00. [DE 387, p. 12, n. 22].

2

proceedings supplementary to and in aid of execution must comply with the procedure of the state where the court is located.  Section 56.29, Florida Statutes, permits plaintiffs to implead a third party based on the filing of an affidavit demonstrating a writ of execution that is valid and unsatisfied.  *See Regent Bank v. Woodcox*, 636 So. 2d 885, 886 (Fla. 4th DCA 1994).  BB&T had obtained a valid Writ of Execution [DE 264] on May 13, 2014, in furtherance of executing on the Judgment against Bellinger.  The undersigned found that BB&T, having submitted an affidavit demonstrating a writ of execution that is valid and unsatisfied [DE 283-1], met the requirements of section 56.29 to commence proceedings supplementary.  [DE 292].

On October 1, 2014, BB&T filed its Complaint in Proceedings Supplementary.  [DE 293].  In the Complaint, BB&T alleges that approximately in or before November of 2011 Bellinger "devised a scheme…to transfer valuable, non-exempt assets, including but not limited to, over $1.7 million in stocks, bonds, and cash, to a Cook Islands Trust."  [DE 293, p. 3].  The aim of this plan, BB&T contends, "was to transfer such assets beyond the reach of Bellinger's creditors or potential creditors, including BB&T."  *Id.*  The distributions from the Trust were initially made to Bellinger's Wells Fargo bank account, but BB&T asserts that Bellinger closed the Wells Fargo account on May 8, 2013—two weeks after this Court granted BB&T's summary judgment motion against Bellinger—and directed the Trustee to make the distributions to Impleaded Defendant, Donnelly, Bellinger's girlfriend, instead of to Bellinger himself.  *Id.*  BB&T alleges that the transfer of the Trust distributions was an actual fraudulent transfer under section 726.105(1)(a), Florida Statutes, because it was made with the actual intent to hinder, delay, or defraud BB&T.  [DE 293, p. 4].  BB&T also claims that Bellinger did not receive reasonably equivalent value in exchange for said transfer, and therefore the transfer alternatively

3

meets the requirements of section 726.105(1)(b) for a constructive fraudulent transfer.  [DE 293, p. 5].

Bellinger denies that any transfer was done with the actual intent to hinder, delay, or defraud BB&T.  *See* DE 296.  According to Bellinger, he had no reasonable expectation that he would owe any money to BB&T arising from BB&T's $3 million loan to Hamilton Greens because the property securing the debt was valued at $15 million, his co-guarantors had a combined net worth of over $100 million, his co-guarantors had indemnified Bellinger from the BB&T claim, and his co-guarantors had discharged all of Bellinger's other contingent liabilities during the previous five years.  [DE 296, p. 4].  Bellinger also claims that he had legitimate, non-fraudulent reasons for creating the Trust in November of 2011, which included concerns over post-divorce claims of his ex-wife, anticipated end-of-life medical expenses, exposure to risk from new and uncertain business ventures, and a desire to secure retirement.  *Id.*

According to Donnelly, the transfers "were not transfers made with an actual intent to hinder, delay, or defraud creditors.  Rather, the transfers were made in order to pay the reasonable and necessary living expenses of Bellinger and expenses incurred by Bellinger in exercising his constitutional right to due process."  [DE 311, p. 6].  Because of this, Donnelly claims she "acted as a mere conduit of the funds from the [Trust] to the persons and entities she transferred the funds to."  [DE 311, p. 8].  Donnelly also argues that a transfer or obligation is not voidable under section 726.105, Florida Statutes, against a person who took a transfer or transfers in good faith and for reasonably equivalent value or against any subsequent transferee or obligee, which she contends she did.  [DE 311, p. 5].

The undersigned held evidentiary hearings on September 28, 2015 and October 7, 2015.  *See* DEs 373, 378.  During both hearings, the Court received into evidence the testimony of

Richard Bellinger; the testimony of Maureen Donnelly; and BB&T's exhibits #1-10, including the following specific documents:

    i.    A copy of the Affidavit of Financial Condition of Richard Bellinger from July 30, 2012;

    ii.    Copies of Richard Bellinger's Statements of Financial Condition dated June 30, 2010 and June 30, 2012;

    iii.    Copies of Richard Bellinger's Wells Fargo bank statements from December 22, 2011 to May 21, 2013;

    iv.    Copies of Richard Bellinger's tax documents from the years 2009, 2010, 2011, and 2012;

    v.    A copy of Laurie Bellinger's 2010 W-2 Form;

    vi.    A copy of the Bellinger Family Trust;

    vii.    A copy of Richard Bellinger and Laurie Bellinger's Marital Rights and Property Settlement Agreement dated May 17, 2011;

    viii.    A copy of the Ora Fiduciary (Cook Islands) Limited Estate Planning Questionnaire of Richard Bellinger dated November 21, 2011;

    ix.    A copy of a letter from Richard Bellinger to Voja Andjelkovic of Merrill Lynch Private Banking dated January 30, 2012; and

    x.    Copies of Maureen Donnelly's Wells Fargo bank statements from May 8, 2013 to January 7, 2015.

Following the October 7th evidentiary hearing, the Court allowed both sides to submit supplemental memoranda. *See* DE 378. BB&T, Bellinger, and Donnelly all submitted supplemental memoranda to the Court. [DEs 385, 386, and 387]. Additionally, on November

20, 2015, this Court asked both sides to submit supplemental memoranda on the issue of this Court's ancillary jurisdiction in these proceedings supplementary. [DE 389]. On December 2, 2015, each party submitted a supplemental memorandum of law to the Court. [DEs 390, 391, 392].

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 69(a)(1), "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." As noted earlier, section 56.29, Florida Statutes, provides the practice and procedure for proceedings supplementary. The Uniform Fraudulent Transfer Act ("UFTA"), codified in chapter 726, Florida Statutes, articulates what constitutes a fraudulent transfer. "The standard to determine whether a transfer is fraudulent under Florida law is the preponderance of the evidence standard." *In re Young*, 235 B.R. 666, 669 (Bankr. M.D. Fla. 1999).

## III.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following are the findings of fact and conclusions of law by the undersigned based on the testimony and evidence presented during both evidentiary hearings on the Complaint in Proceedings Supplementary [DE 293].

### A. Preliminary Factual Findings

Defendant Donnelly is the long-time girlfriend of Defendant Bellinger. Donnelly has known Bellinger since 1986 and always perceived him as an honest businessman with high integrity. Donnelly's relationship with Bellinger started as a professional one and evolved into a personal one in approximately 2006. Donnelly worked as a secretary and bookkeeper for

Bellinger's company, RPB Development, from about 2006 through 2015, when she retired. Donnelly and Bellinger live together and share a personal and romantic relationship.

The underlying lawsuit started when BB&T filed a claim for breach of contract against Bellinger, BLG Enterprises, LLC, Hamilton Greens, LLC, Devcon Livingston Greens, LLC, Chad Labonte, and Roland Labonte on May 5, 2011. *See* DE 1. The claim against Bellinger was based upon a personal guaranty he had signed on a loan that BB&T made to fund a property owned by Hamilton Greens, LLC. *Id.* During the underlying litigation, BB&T filed motions for summary judgment against Bellinger on July 1 and October 10, 2011. [DEs 25, 30]. Bellinger responded to the summary judgment motions, and filed an affidavit in support of his opposition, on November 17, 2011. [DEs 41, 42].

Also on November 17, 2011, Ora Fiduciary Unlimited, the company that set up Bellinger's Cook Islands Trust, sent Bellinger an Estate Planning Questionnaire for him to complete in order to establish the Trust. [DE 377-13, p. 1]. Bellinger's testimony, which this Court found to be credible, established that he created the Trust for multiple reasons: (1) the unusual nature of Bellinger's Marital Settlement Agreement with his ex-wife, which he thought she may violate and seek more money from him; (2) end-of-life medical expenses that he anticipated because of his mother's recent passing from Alzheimer's disease; (3) exposure to risk from new and uncertain business ventures in commercial property; and (4) a desire to secure his retirement. According to Bellinger, the claim of BB&T was not a factor in creating the Trust because the property securing the subject $3 million loan from BB&T was valued at $15 million; his co-guarantors had a combined net worth of over $100 million; his co-guarantors agreed to indemnify Bellinger for any liability in relation to the BB&T claim; and his co-guarantors had

discharged all of Bellinger's other contingent liabilities (based on similar personal guaranties he had signed) during the previous five years.

The Trust was settled on November 30, 2011. [DE 377-11]. The listed beneficiaries of the Trust were Bellinger, Bellinger's two adult children, Bellinger's heirs-at-law, and Donnelly. *Id.* Bellinger testified that he cannot revoke the Trust, cannot override the Trustee, and cannot replace the Trustee. On January 30, 2012, Bellinger instructed Merrill Lynch to transfer cash and certain other assets to the Cook Islands Trust in the amount of $1,629,934.00, and this was completed on February 10, 2012. [DE 377-1, p. 13]. BB&T was unaware of the creation of the Trust at this time. However, Bellinger notified BB&T of the existence of the Trust on August 7, 2012 in a financial affidavit. [DE 385, p. 4].

In the underlying litigation, BB&T filed an amended motion for summary judgment, which was granted in favor of BB&T and against Bellinger on April 29, 2013. [DE 209]. The Court entered the Judgment against Bellinger in the amount of $4,923,797.57[2] on May 28, 2013. [DE 211].

Bellinger was originally the only person who received distributions from the Trust. He testified that he was also the only person who could request distributions from the Trust, but that these requests were not always honored.[3] Bellinger received distributions from the Trust of approximately $7,000 per month to pay his living expenses because he had no income at the time. Distributions from the Trust were made to Bellinger's Wells Fargo bank account, but on May 8, 2013, Bellinger withdrew all the funds from his Wells Fargo account and closed the account. Bellinger admitted that he closed his bank account because he knew that BB&T would

---

[2] Although BB&T claimed in its Complaint in Proceedings Supplementary that "BB&T has not received satisfaction of the Final Judgment or any portion thereof," the Judgment was partially satisfied by payments of $2,000,314.90; $386,183.00; and $20,370.00. [DE 387, p. 12, n. 22].
[3] However, Bellinger stated at the hearing that the only distribution request which was denied was when he requested that the Trust pay part of the Judgment to BB&T.

garnish the account, and he did not want to suffer the embarrassment of having people at Wells Fargo, whom he associated with, knowing that his account was garnished.

Donnelly went with Bellinger to Wells Fargo on May 8, 2013 to close his account and, on the same date, she opened a Wells Fargo bank account solely in her name. Donnelly deposited into this account the funds that Bellinger withdrew from his closed account. Donnelly stated that she and Bellinger came to an agreement that she would hold this money in her Wells Fargo account and begin to receive distributions from the Trust in order to pay the living expenses and bills of Bellinger.

Bellinger then requested that the Trustee of the Trust start making the Trust distributions to Donnelly instead of to himself. According to Bellinger, he made this arrangement so that he would not have to worry about paying his bills or living expenses. Under this arrangement with Donnelly, Bellinger was able to log on to Donnelly's Wells Fargo online banking account, he had access to a debit card for the account, he could withdraw money from the account, and he filled out the checks for the account, which he then would have Donnelly sign because he did not have signatory authority on the account.

At the time of the evidentiary hearings in these proceedings supplementary, there were no longer any monthly distributions from the Trust being paid to Donnelly or to Bellinger. Bellinger caused the monthly distributions to Donnelly's account to be stopped in January of 2015. Bellinger estimated that, in total, there was approximately $305,000.00 transferred to Donnelly's Wells Fargo account from the Trust. The last distribution from the Trust to Donnelly, as listed in her Wells Fargo bank statement, submitted as BB&T's Exhibit 10, was on January 7, 2015. *See* DE 377-15, p. 84. The only Trust distributions made to Donnelly's

account since then, Bellinger explained, were made for legal fees associated with Bellinger's and Donnelly's representation in this case.

**B. <u>Specific Relief Sought by BB&T</u>**

As an initial matter, the Court will discuss what claims were pled and what relief was sought by BB&T in initiating these proceedings supplementary. The Complaint, argument at the hearings, and memoranda submitted by BB&T appear to assert different claims and ask for varying forms of relief. During inquiry at the hearings, the Court was not given a clear answer as to what specific claims and relief BB&T was pursuing. The vagueness and lack of clarity in BB&T's Complaint, memoranda, and oral arguments have unnecessarily complicated this proceeding, resulting in the expenditure of substantial judicial resources and the necessity of a lengthy Report and Recommendation to address all the issues raised by the parties.

In the Complaint in Proceedings Supplementary [DE 293] filed on October 1, 2014, BB&T alleges that "Bellinger devised a scheme (hereinafter the 'Asset Diversion Scheme') to transfer valuable, non-exempt assets, including but not limited to, over $1.7 million in stocks, bonds, and cash, to a Cook Islands Trust." [DE 293, p. 3]. According to BB&T, the Asset Diversion Scheme was meant to "transfer such assets beyond the reach of Bellinger's creditors or potential creditors, including BB&T." *Id.* Then, BB&T asserts that "Bellinger directed the trustee to stop making the Trust distributions to him, and to instead make them to Donnelly (the 'Asset Transfer')." *Id.* Thus, in the Complaint, BB&T treated and defined the initial 2011 creation of the Trust and transfer of assets by Bellinger to the Trust in 2012 as a separate event from the subsequent payment of distributions from the Trust to Donnelly from May 8, 2013 through January 7, 2015.

BB&T goes on in the Complaint to allege, in its sole count (Count I), that the "Asset Transfer was a fraudulent transfer as to BB&T pursuant to § 726.105(1)(a), Fla. Stat. because such transfer was made with the actual intent to hinder, delay, or defraud BB&T." [DE 293, p. 4]. BB&T argued that it was "entitled to seek application of the valuable assets of Bellinger fraudulently transferred to Donnelly via the Trust to satisfy the Final judgement, and an injunction preventing Donnelly from receiving further disbursements from the Trust." [DE 293, p. 5].

In conclusion, BB&T asked for "a judgment finding that the Asset Transfer was a fraudulent transfer as to Plaintiff, ordering the distributions of the Trust in the possession of Maureen Donnelly to be applied to the Judgment and awarding to Plaintiff its reasonable attorneys' fees and costs incurred, alternatively, awarding judgment in favor of Plaintiff against Richard Bellinger and Maureen Donnelly, jointly and severally, for the value of the assets transferred, and granting such other further relief as the Court deems proper." *Id.* Accordingly, although the Complaint did define what BB&T referred to as the Asset Diversion Scheme, the Complaint did not clearly and sufficiently seek any relief as to that alleged Asset Diversion Scheme. Rather, the Complaint specifically sought relief as to what it referred to as the subsequent Asset Transfer.

In summary, the primary relief sought by BB&T in its Complaint was: (1) that the Court issue a judgment finding that the "Asset Transfer" (not the "Asset Diversion Scheme") was a fraudulent transfer as to BB&T; (2) that this Court order that the distributions of the Trust in the possession of Donnelly be applied to BB&T's Judgment; and (3) that this Court award BB&T its reasonable costs and attorney's fees in these proceedings supplementary. Any other relief sought in BB&T's Complaint was in the alternative to BB&T's primary requested relief described

above and did not clearly and specifically refer to the so-called "Asset Diversion Scheme." Furthermore, BB&T never sought to amend the Complaint.

Over time, however, BB&T's request for relief seemed to expand beyond what it requested in its Complaint. For example, in BB&T's Brief Regarding Evidentiary Hearing on Complaint in Proceedings Supplementary [DE 371], BB&T did not specifically allege which transfer it was seeking to avoid, the creation of the Trust and transfer of assets to the Trust in 2011-2012 or the payment of the Trust distributions to Donnelly from 2013 through 2015. BB&T instead referred generically to "transfers." In the conclusion section of its Brief, BB&T claimed entitlement to "(i) the avoidance of the transfers to the extent necessary to satisfy BB&T's claim; (ii) an attachment or other provisional remedy against the assets transferred or other property of the Defendant in accordance with applicable law; (iii) subject to applicable principles of equity and in accordance with applicable rules of civil procedure: (1) an injunction against further disposition by the [sic] Bellinger or Donnelly, or both, of the assets transferred or of other property; (2) appointment of a receiver to take charge of the assets transferred or of other property of the Defendants; or, (3) any other relief the circumstances may require; (iv) because BB&T has obtained a judgment on a claim against the [sic] Bellinger, a levy execution on the assets transferred or their proceeds; (v) an award to BB&T of its reasonable attorneys' fees and costs in obtaining such relief; and (vi) such other and further relief as the Court deems proper." [DE 371, p. 20]. This seems to be a request for broader relief than the primary relief requested in the Complaint.

In an effort to gain some clarity as to the specific relief sought by BB&T, the Court inquired from BB&T's counsel at the evidentiary hearings precisely what relief BB&T was seeking. BB&T's counsel stated that BB&T was seeking avoidance of the initial transfer of

approximately $1.7 million to the Trust in 2012 because it was a fraudulent transfer, as well as avoidance of the subsequent transfer of the Trust distributions to Donnelly from 2013-2015 because that was also a fraudulent transfer. BB&T's counsel argued that the Court should enter a $1.7 million judgment against both Bellinger and Donnelly due to the initial transfer to the Trust, as well as a $305,000 judgment against Bellinger and Donnelly due to the payments to Donnelly from the Trust, and additionally, any and all forms of relief under sections 726.108 and 726.109, Florida Statutes.

Defendants Bellinger and Donnelly opposed this broad request for relief by BB&T and argued that BB&T cannot seek to avoid the transfer of assets from Bellinger to the Trust, that is, the so-called "Asset Diversion Scheme," because that relief was not requested in BB&T's Complaint in Proceedings Supplementary and, further, the Trust is not a party to this action and is not subject to the jurisdiction of this Court. Moreover, counsel for Bellinger, Steven A. Mayans, Esq., represented that he had spoken to BB&T's previous counsel[4] on the phone soon after the Complaint was filed, and he was assured by BB&T's counsel that BB&T was only seeking to avoid the transfer of the Trust distributions to Donnelly from 2013 to 2015 and was not seeking to avoid the initial creation of the Trust or transfer of assets to the Trust in 2011-2012. BB&T has never disputed that its prior counsel, Ms. Thomas, made these representations to Mr. Mayans.

In reviewing BB&T's Complaint, it is important to note that Federal Rule of Civil Procedure 8(a) provides: "A pleading that states a claim for relief must contain…a short and plain statement of the claim showing that the pleader is entitled to relief [and] a demand for the

---

[4] Although the law firm of Roetzel & Andress has represented BB&T throughout these entire proceedings, the Complaint in Proceedings Supplementary was filed by a different attorney than the one currently working on the case. *See* DE 293, p. 6. Since the Complaint was filed, a new attorney, M. Robert Malani, has been assigned to the BB&T matter and he filed a Notice of Appearance on May 8, 2015. [DE 314]. The prior attorney, Shayne A. Thomas, is no longer with the firm. [DE 312].

relief sought, which may include relief in the alternative or different types of relief."  Without fair notice of what claim a pleader is pursuing or what relief a pleader is requesting, the defendant is left guessing as to what claims it must defend against.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-14 (2002); *Court-Appointed Receiver of Lancer Offshore, Inc. v. Citico Group Ltd.*, 2008 WL 926506, at *2 (S.D. Fla. Mar. 31, 2008).  *See also* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence—and each defense other than a denial—must be stated in a separate count or defense").  Here, the Complaint specifically sought to deem the 2013-2015 "Asset Transfer" a fraudulent conveyance and sought specified relief as to that "Asset Transfer."  As noted above, Mr. Mayans, Bellinger's counsel, contacted Shayne A. Thomas, Esq., counsel for BB&T, about this issue soon after the Complaint in Proceedings Supplementary was filed.  BB&T's counsel, Ms. Thomas, informed Bellinger's counsel that BB&T was indeed seeking only to avoid the 2013-2015 Trust distributions made to Donnelly, not the initial creation of the Trust or transfer of approximately $1.7 million to the Trust.  The Court accepts and credits Mr. Mayans' representation as to his conversation with Ms. Thomas, which conversation was never disputed by BB&T.  The Court finds that Bellinger and his counsel, and Donnelly and her counsel, justifiably relied on that representation by BB&T's counsel.[5]  BB&T may not seek any relief which its counsel affirmatively represented to Bellinger's counsel that it was not seeking.

Further, BB&T may only seek to obtain the relief it sought in its Complaint.  Because BB&T's Complaint does not sufficiently seek any relief as to the initial creation of the Trust in

---

[5] The Court is quite frankly surprised and troubled that one attorney for BB&T, Ms. Thomas, would represent to Bellinger's counsel, Mr. Mayans, that BB&T was not seeking any relief as to the initial 2011 creation of the Trust and 2012 transfer of approximately $1.7 million in assets to the Trust by Bellinger, and subsequently another attorney for BB&T from the same law firm, Mr. Malani, would stand before the Court and, in contravention of Ms. Thomas' representation, seek a judgment against both Bellinger and Donnelly in the amount of approximately $1.7 million for that very same transaction.

2011 and the transfer of assets to the Trust in 2012, the Complaint fails to state a claim for which relief can be granted as to the Trust creation and funding. Bellinger and Donnelly would be severely and unfairly prejudiced if the Court allowed BB&T to proceed on unpled claims, causes of action, or relief, especially when counsel for BB&T affirmatively represented to Bellinger's counsel that BB&T was not seeking such relief.

With all that being said, however, and to add more confusion to this issue, the parties to this case all nonetheless argue that this Court must address whether or not Bellinger's creation of the Trust in 2011 and initial transfer of approximately $1.7 million in assets to the Trust in 2012 was or was not a fraudulent transfer, albeit for different reasons. On the one hand, BB&T urges this Court to find that the creation of the Trust and initial transfer of assets to the Trust by Bellinger was a fraudulent transfer so as to justify the imposition of relief in favor of BB&T and against Bellinger and Donnelly based on that finding. BB&T asserts that this Court should find the initial creation and funding of the Trust to be a fraudulent transfer and then impose an approximate $1.7 million judgment against both Bellinger and Donnelly.

On the other hand, Bellinger and Donnelly assert that even though BB&T's Complaint in Proceedings Supplementary did not properly plead or seek any relief against them as to the initial alleged fraudulent creation and funding of the Trust, the Court should nonetheless address that issue and find that the initial creation and funding of the Trust was not a fraudulent transfer. This is so because, according to them, such a finding would then preclude any finding by the Court that the subsequent payment of Trust distributions to Donnelly was a fraudulent transfer as that initial transfer "forms the factual predicate upon which BB&T's claims are based." [DE 385, p. 2]. The Defendants' position is that if the original creation and funding of the Trust is deemed to be legitimate and not a fraudulent transfer, then the assets of the Trust no longer

15

belong to the debtor, Bellinger, and the distributions to Donnelly from the Trust cannot constitute a fraudulent conveyance.

Though the undersigned does not fully agree with any of the parties' arguments in this regard, the Court does believe that, for purposes of clarity, finality and context in this complex and drawn out litigation, Bellinger's 2011 creation of the Trust and 2012 transfer of assets to the Trust should be addressed by the Court along with the subsequent 2013-2015 distributions made to Donnelly from the Trust. Therefore, the Court will determine: (1) whether Bellinger's 2012 transfer of $1.7 million in assets in creation of the Trust constituted a fraudulent transfer; and (2) whether the 2013-2015 payment of Trust distributions to Donnelly constituted a fraudulent transfer.

## C. Fraudulent Transfers Under Florida Law

Chapter 726, Florida Statutes, governs fraudulent transfers in Florida. Under the UFTA, there are two ways in which a court can find that a transfer was fraudulent as to present and future creditors. Specifically, section 726.105(1), Florida Statutes, provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (a) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (b) [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> > (1) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > (2) [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Section 726.105(1)(a) is referred to as actual fraud, and section 726.105(1)(b) is referred to as constructive fraud. BB&T labels Count I of its Complaint as "Fraudulent Transfer Pursuant to § 726.105(1)(a), Fla. Stat." [DE 293, p. 4]. This is the actual fraud portion of the statute.

However, within Count I, BB&T asserts that the Asset Transfer to Donnelly was both a "fraudulent transfer as to BB&T pursuant to § 726.105(1)(a), Fla. Stat." and "a fraudulent transfer as to BB&T pursuant to § 726.105(1)(b), Fla. Stat." [DE 293, pp. 4-5]. The Complaint, therefore, although poorly drafted, appears to seek avoidance of the transfers to Donnelly under both the actual fraud and the constructive fraud provisions of the statute. Thus, both theories of fraud will be addressed by the Court.

   i.) <u>Actual Fraud:</u>

To establish a prima facie case of actual fraud, a plaintiff must show that (1) there was a creditor to be defrauded, (2) there was a conveyance of property that could have been applied to payment of the debt due, and (3) there was a debtor intending fraud. *See Nat'l Mar. Servs., Inc. v. Straub*, 979 F. Supp. 2d 1322, 1327 (S.D. Fla. 2013). Then, under section 56.29(6), Florida Statutes, the burden is on the transferee to prove that the transfer was not fraudulent. *Id.*

Under the UFTA, a "creditor" is defined as "a person who has a claim." § 726.102(5), Fla. Stat. A "claim" is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 726.102(4), Fla. Stat. Therefore, "[a] transfer made...by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made." § 726.106(1), Fla. Stat. The next step in the analysis is for the court to look at whether there was a conveyance of property that could have been applied to payment of the debt. Finally, the court determines whether there was a debtor intending fraud.

Because determining the "intention of fraud" element is difficult, section 726.105(2), Florida Statutes, lists eleven non-exclusive factors to consider in determining whether a transfer was made with intent to defraud creditors. *Yaralli v. Am. Reprographics, LLC*, 165 So. 3d 785,

788 (Fla. 4th DCA 2015).  These factors are referred to as "badges of fraud."  *Id.*  They include whether: (a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property transferred after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) the transfer was for substantially all of the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) the transfer occurred shortly before or after a substantial debt was incurred; and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider or the debtor.  § 726.105(2), Fla. Stat.

Although the presence of a single badge of fraud does not amount to a finding of fraud, the presence of multiple badges of fraud will justify a finding of fraud.  *Yaralli*, 165 So. 3d at 789.  When badges of fraud are present, it creates a prima facie case and raises a rebuttable presumption that the transaction is void.  *Straub*, 979 F. Supp. 2d at 1328.  However, "[i]t is clear from the language of the Statute that in determining intent, consideration may be given to factors other than those listed above."  *In re Miller*, 188 B.R. 302, 306 (Bankr. M.D. Fla. 1995).  When analyzing a particular transfer, "courts generally consider the totality of the circumstances" in addition to the badges of fraud.  *In re Ramsurat*, 361 B.R. 246, 253 (Bankr. M.D. Fla. 2006).

ii.) Constructive Fraud:

Alternatively, to establish a prima facie case for constructive fraud, under these factual circumstances[6], Plaintiff must show that: (1) the debtor did not receive "reasonably equivalent value" in exchange for the transfer; and (2) the debtor "[i]ntended to incur, or believed or

---

[6] Bellinger was not engaged in a business transaction in making either transfer.  *See* § 726.105(1)(b)1., Fla. Stat.

reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." *See* § 726.105(1)(b)2., Fla. Stat.

**D. Bellinger's 2011 Creation of the Cook Islands Trust and Initial 2012 Transfer of Approximately $1.7 Million in Assets to the Trust**

The Court finds that Bellinger's 2011 creation of the Cook Islands Trust and initial 2012 transfer of approximately $1.7 million in assets to the Trust was not a fraudulent transfer. There are several reasons for this finding.

As to BB&T's claim of actual fraud under section 726.105(1)(a), it is clear that BB&T filed its underlying claim against Bellinger on May 5, 2011. [DE 1]. As stated earlier, a debtor's transfer may be fraudulent as to a creditor whose claim arose before the transfer was made, whether or not that claim had been reduced to judgment yet. *Straub*, 979 F. Supp. 2d at 1328. The Trust was settled on November 30, 2011, Bellinger requested that the assets be transferred to the Trust on January 30, 2012, and the assets were transferred to the Trust on February 10, 2012. [DE 377-1, p. 13]. Thus, BB&T was a creditor of Bellinger under the UFTA when Bellinger created the Trust on November 30, 2011, when Bellinger requested the assets be transferred to the Trust on January 30, 2012, and when the assets were actually transferred to the Trust on February 10, 2012. Moreover, the assets Bellinger transferred to the Trust were cash and equity positions he had in certain Merrill Lynch accounts. [DE 377-14]. The assets that were transferred to the Trust, therefore, were property of Bellinger that could have been applied to payment of the debt.

Looking at the pertinent badges of fraud, Bellinger did retain some control of the property after it was transferred to the Trust. That much is evident from Bellinger's United States Gift Tax Return for 2012, which states "for purposes of the federal gift tax, [Bellinger] continues to possess dominion and control over the property transferred to the Trust." [DE 377-

9, p. 62]. That document also states that Bellinger "has retained a non-general power to appoint the Trust property...[and] the power to change the beneficiaries of the Trust and/or the interests of the beneficiaries as among themselves." *Id.* According to the testimony and evidence, Bellinger can request that distributions from the Trust be made to specific beneficiaries in specific amounts, but it is ultimately up to the Trustee to decide if Bellinger's request will be honored. Bellinger cannot revoke the Trust, override the Trustee, or replace the Trustee. Therefore, for purposes of a fraudulent transfer, Bellinger has not retained full control of the Trust; his control is limited and inferior to that of the Trustee.

Furthermore, before the alleged transfer of assets to the Trust was made, Bellinger had been sued. The underlying Complaint in this case was filed on May 5, 2011. [DE 1]. Bellinger settled the Trust on November 30, 2011 [DE 377-11] and requested that the assets be transferred to the Trust on January 30, 2012 [DE 377-14]. Although this much is true, the Court finds that Bellinger reasonably believed that he would not be liable if a judgment was entered against him. Bellinger credibly testified that he believed that if any judgment was entered against him, the Labontes[7] would pay it because he had an indemnification agreement with them, as his co-guarantors on the loan, and they had paid other judgments for Bellinger in the past. Moreover, the subject loan of $3 million was secured by the Hamilton Greens property, which Bellinger reasonably believed was worth at least $10 million. According to Bellinger, the property was appraised at $10.1 million in 2006. Bellinger estimated at the hearing that, when he left the project in 2007, he believed the property was worth over $15 million.[8]

---

[7] Chad Labonte and Roland Labonte were codefendants in the underlying lawsuit and co-guarantors with Bellinger on the loan.
[8] Bellinger based this estimate on his extensive experience in the real estate market, the prior appraisal of $10.1 million that was done on the property, and the fact that the Labonte's obtained development rights for the Hamilton Greens property subsequent to the $10.1 million appraisal.

As to the initial 2012 transfer of Bellinger's assets to the Trust, the Court finds that this transfer was not concealed by Bellinger.  BB&T claims that the transfer of assets to the Trust was not disclosed to them and that it learned of the transfer during post-judgment discovery. [DE 283, p. 2; DE 293, p. 4].  However, Bellinger informed BB&T of the creation of the Trust within months after transferring the assets to the Trust, which was funded on February 10, 2012. [DE 377-1, p. 13].  Specifically, Bellinger notified BB&T of the existence of the Trust on August 7, 2012 in a financial affidavit provided to BB&T in connection with a mediation proceeding. [DE 385, p. 4].  Therefore, the Court finds that Bellinger was not attempting to conceal the Trust from BB&T.

A factor weighing in BB&T's favor, which the Court has carefully considered, is that the transfer of assets to the Trust was for substantially all of Bellinger's assets.  Under the UFTA, an "asset" does not include property to the extent that it is generally exempt under nonbankruptcy law.  § 726.102(2)(b), Fla. Stat.  Bellinger testified that, after transferring the $1,629,934.00 in assets to the Trust, his remaining assets were: (1) his homestead property, valued at approximately $350,000.00; (2) his IRA, valued at approximately $300,000.00; and (3) cash and other miscellaneous property, valued at approximately $75,000.00.  *See also* DE 377-1, p. 20. Under nonbankruptcy law, Bellinger's homestead property and IRA would be exempt property. *See* Fla. Const. art. X § 4; § 222.21, Fla. Stat.  Therefore, Bellinger was left with approximately $75,000.00 in assets after the transfer of assets to the Trust, and the total amount Bellinger transferred to the Trust was approximately 95.60% of his assets.[9]  This clearly constitutes substantially all of Bellinger's assets.

---

[9] Total amount of Bellinger's assets before transfer to Trust = $1,629,934.00 (assets transferred to Trust) + $75,000 (remaining assets) = $1,704,934.00.  Thus, the percentage of assets transferred to the Trust = $1,629,934.00/$1,704,934.00 = 95.6%.

The Court has considered all of the badges of fraud alleged by BB&T. BB&T has proven several badges of fraud, and therefore BB&T has established a prima facie case of actual fraud and has raised a rebuttable presumption that the transaction is void. Despite BB&T having established several badges of fraud, the Court finds that Bellinger sufficiently rebutted the rebuttable presumption. Bellinger credibly testified as to his reasons for creating the Trust in 2011. With regard to the creation and funding of the Trust, the undersigned found Bellinger's demeanor and testimony to be candid and truthful. First, Bellinger had a marital settlement agreement [DE 377-12] with his ex-wife, which he believed she may violate and seek more money from Bellinger in the future because of its unique terms. Second, Bellinger's mother passed away from Alzheimer's disease, and he witnessed how her medical expenses drained all of her financial assets. He was reasonably concerned that he, too, may ultimately suffer from Alzheimer's disease, which could negatively impact his assets. Third, Bellinger was considering getting into the commercial real estate development business, which was apparently volatile, and he wanted to protect his assets from any future creditors' claims. Fourth, Bellinger wanted to secure funds for his support after his retirement. For all of these reasons, Bellinger attested that he created the Trust. Taking into account all the evidence and the totality of the circumstances that surrounded the 2011 creation of the Trust and the 2012 conveyance of Bellinger's assets to the Trust, the undersigned concludes Bellinger set forth legitimate reasons for creating the Trust. *See In re Bifani*, 580 Fed. Appx. 740, 745 (11th Cir. 2014). The Court finds that Bellinger created the Trust in 2011 and transferred the assets to the Trust in 2012 in good faith, without any intent to defraud BB&T. A careful review of all the evidence and the totality of the circumstances supports a finding that the transfer of approximately $1.7 million in assets by Bellinger to the Trust in 2012 was not a fraudulent transfer.

The undersigned previously distinguished this case from *S.E.C. v. Solow*, 682 F. Supp. 2d 1312 (S.D. Fla. 2010) in the Report and Recommendation [DE 240] on the Motion to hold Bellinger in civil contempt, and that distinction bears repeating here. Unlike the defendant in *Solow*, Bellinger did not divest himself of his assets in anticipation of the judgment that was about to be entered against him. *Id.* at 1328. Bellinger set forth a number of legitimate bases for creating the Trust. Moreover, Bellinger made good faith, reasonable efforts to retrieve the assets that he transferred to the Trust when he realized he would be liable for the BB&T Judgment on his own, and he asked the Trustee to make distributions to BB&T to pay a portion of the Judgment. *Id.* The Trustee refused Bellinger's request. For all of the reasons stated in this Report and Recommendation, the undersigned finds that the Trust was created and the assets transferred to the Trust in good faith and without actual fraudulent intent. The Court rejects BB&T's claim of actual fraud regarding Bellinger's 2011 creation and 2012 funding of the Trust, and the Court finds that BB&T failed to establish such claim by a preponderance of the evidence.

As to BB&T's claim of constructive fraud under section 726.105(1)(b), BB&T has failed to make a sufficient showing that Bellinger believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due when he created the Trust in 2011 or when he transferred the assets to the Trust in 2012. As discussed above, Bellinger testified at the evidentiary hearings that, when he created the Trust and transferred the assets to it, he was not concerned about having to pay a judgment to BB&T. According to Bellinger, he believed that even if there was a judgment entered against him, the Labontes, as co-guarantors on the loan, would pay it, as they always did for Bellinger. Also, as noted above, the property securing the $3 million loan had been appraised at $10.1 million, and Bellinger believed it had increased in value since the appraisal. Therefore, Bellinger reasonably believed that the value of

the property securing the loan was much higher than the loan amount.   Finally, Bellinger explained that he had an indemnification agreement with the Labontes, whom he believed to be worth over $100 million, which he fully anticipated they would honor.   The Court finds Bellinger's testimony to be credible.   Although Bellinger was a guarantor on the loan together with the Labontes, there was an established pattern of the Labontes paying off several of the loans that Bellinger guaranteed.   Thus, it was objectively and subjectively reasonable for Bellinger to rely on this pattern of behavior when he transferred assets to the Trust in 2012.   For those reasons, and based on a review of all the evidence and the totality of the circumstances, the Court rejects BB&T's claim of constructive fraud and further finds that BB&T did not prove, by a preponderance of the evidence, its claim of constructive fraud as to the 2011 creation of the Trust and 2012 transfer of assets to the Trust.

Moreover, it bears mentioning that even if the Court were to find (which it does not) that the Trust was created and funded by Bellinger with fraudulent intent as a fraudulent transfer, BB&T would not be entitled to an additional judgment against Bellinger for the approximate $1.7 million in assets transferred to the Trust in 2012.   "A fraudulent conveyance action is simply another creditors' remedy."   *Yusem v. S. Fla. Water Mgmt. Dist.*, 770 So. 2d 746, 749 (Fla. 4th DCA 2000).   A fraudulent conveyance action is not a means to obtain another judgment against the debtor.   *See* § 726.108, Fla. Stat.   That is not one of the creditors' remedies listed in the statute, and that is not the purpose of the statute.   *See Yusem*, 770 So. 2d 749.   Therefore, in this fraudulent conveyance action, BB&T would not be entitled to an additional, redundant judgment against Bellinger for the amount transferred to the Trust even if Bellinger had acted with fraudulent intent and made a fraudulent transfer, which he did not.   Instead, under Florida's

fraudulent conveyance statute, BB&T's remedy would be to seek to recover those funds from the transferee, not obtain another judgment against Bellinger.

### E. Donnelly's Alleged Involvement in the 2011 Creation of the Cook Islands Trust and 2012 Transfer of Bellinger's Assets to the Trust

Despite having failed to properly plead such claim for relief in its Complaint in Proceedings Supplementary, BB&T argued that this Court should enter a judgment against Donnelly for the approximate $1.7 million transferred to the Trust by Bellinger in 2012. However, even if BB&T had properly pled this claim and properly sought this relief against Donnelly (which it did not), and even if BB&T had proved that Bellinger's $1.7 million transfer to the Trust was a fraudulent transfer (which it did not), it is clear that BB&T utterly failed to prove that Donnelly had a role in the 2011 creation of the Cook Islands Trust or in the 2012 transfer of Bellinger's assets to the Trust sufficient to foist liability upon her. BB&T's evidence against her in this regard is woefully lacking and insufficient.

It seems that BB&T is attempting to assert liability against Donnelly for Bellinger's creation and funding of the Trust based upon a coconspirator or aiding and abetting theory, or based upon some other unpled, vague theory. However, at the time that Bellinger created and funded the Trust, Donnelly was not a debtor to BB&T and she was not the transferee receiving any assets. Furthermore, the Florida Supreme Court has held that there is not a cause of action for aiding and abetting a fraudulent transfer when the alleged aider-abettor is not a transferee. *Freeman v. First Union Nat. Bank*, 865 So. 2d 1272, 1276 (Fla. 2004). Thus, Donnelly could not be found liable for the 2011 creation of the Trust or the 2012 transfer of Bellinger's assets to the Trust even if it was a fraudulent transfer, which it was not. Donnelly had insufficient involvement in, and therefore no liability for, Bellinger's creation of the Trust in 2011 or transfer

of assets to the Trust in 2012.  The Court finds BB&T's claim against Donnelly in this regard to be without merit and frivolous.

## F. BB&T Failed to Join the Trust or Trustee

As noted previously, BB&T has argued to this Court that the 2012 transfer of approximately $1.7 million in assets by Bellinger in creation of the Trust was a fraudulent transfer.  Yet, BB&T did not join or even attempt to join the Trust or Trustee—the transferee of Bellinger's assets—as a party in these proceedings supplementary.  Additionally, neither the Trust nor the Trustee is located within the jurisdiction of this Court; they are located in the Cook Islands.  It is clear that BB&T never served a summons upon the Trust or Trustee even though "the service of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served."  *Miss. Pub. Corp. v. Murphree*, 326 U.S. 438, 444-45 (1946); *see also* Fed. R. Civ. P. 4(a)(1) ("A summons must: (A) name the court and the parties; [and] (B) be directed to the defendant").  If this Court were to impose a judgment against the Trust or the Trustee, that would violate due process.  Thus, this Court has no jurisdiction over the Trust or the Trustee without the Trust or Trustee being named as a party in a properly pled complaint and being served with process.

## G. Payment of Trust Distributions to Donnelly from May 2013 to January 2015

The Court will now consider whether the payment of the Trust distributions to Donnelly from 2013-2015 amounted to a fraudulent transfer, which claim was properly pled by BB&T in its Complaint in Proceedings Supplementary [DE 293].

As to BB&T's actual fraud claim under section 726.105(1)(a), it is clear that BB&T was a "creditor" of Bellinger under the UFTA in May 2013 when Bellinger caused the Trust distributions that he was receiving to be paid to Donnelly.  The original underlying Complaint in

this case was filed on May 5, 2011. *See* DE 1. BB&T's claim was reduced to judgment in the amount of $4,923,797.57 on May 28, 2013 [DE 211]. Again, as noted previously, a debtor's transfer may be fraudulent as to a "creditor" whose claim arose before the transfer was made, whether or not that claim has been reduced to judgment yet. *Straub*, 979 F. Supp. 2d at 1328. Thus, BB&T was considered a "creditor" of Bellinger for purposes of the UFTA when Bellinger caused the Trust distributions to be transferred and paid to Donnelly from on or about May 2013 through January 2015.

Bellinger and Donnelly argue that the 2013-2015 Trust distributions to Donnelly did not constitute a fraudulent conveyance. First, Donnelly argues in her First Affirmative Defense [DE 297, p. 4] and elsewhere, which Bellinger adopts, that the Trust distributions made to Donnelly were not "transfers" under section 726.102. [DE 311, p. 4]. Section 726.102(14) defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." According to section 726.102(2), an "asset" is property of a debtor. Bellinger and Donnelly assert that the Trust distributions made to Donnelly from May 2013 through January 2015 were not "property of the debtor," Bellinger, because once Bellinger transferred the assets to the Trust in 2012, they became property of the Trust. [DE 311, p. 4; DE 385, p. 2]. Bellinger settled the Trust on November 30, 2011 and funded the Trust on February 10, 2012. [DE 377-1, p. 13; DE 377-11]. Therefore, Bellinger and Donnelly assert that the moneys in the Trust were no longer assets of Bellinger after February 10, 2012, when the Trust was funded, because once those assets were lawfully transferred to the Trust they belonged to the Trust, not to Bellinger.

BB&T countered this argument at the evidentiary hearings, in part, by arguing that the Trust was the alter ego of Bellinger, which destroys the Trust relationship. However, a court in the Middle District of Florida recently held that "[b]ecause the Florida Trust Code (and Florida courts) are so protective of the sanctity of trusts, the Court doubts that the alter ego doctrine applies to irrevocable trusts and is unwilling to extend the doctrine under the circumstances presented in this case." *In re Eddy*, No. 6:12-bk-04736-CCJ, 2015 WL 1585513, at *4 (Bankr. M.D. Fla. April 3, 2015). Moreover, BB&T never pled this alter ego theory in its Complaint and never made the Trust or the Trustee a party to this action. BB&T also failed to prove its unpled alter ego allegation with sufficient facts. Under the circumstances presented in the instant case, the undersigned finds that BB&T's belated alter ego theory should not and cannot be applied to Bellinger and the Trust. But this does not end the inquiry.

Regarding Bellinger and Donnelly's argument that the Trust assets were not property of Bellinger, it is true that "[a] debtor can only commit fraud on his creditors by disposing of such property as the creditor would have a legal right to look for satisfaction of his claim...Creditors have no right to complain of dealings with property which the law does not allow them to apply on their claims, even though such dealings are with a purpose to hinder, delay or defraud them." *In re Matthews*, 360 B.R. 732, 746 (Bankr. M.D. Fla. 2007) (quoting *In re Kimmel*, 131 B.R. 223, 229 (Bankr. S.D. Fla. 1991)). Under Florida law, when a trust contains a valid spendthrift provision, a creditor of a beneficiary cannot reach any interest or distribution from the trust until the beneficiary receives the interest or distribution. *Miller v. Kresser*, 34 So. 3d 172, 175 (Fla. 4th DCA 2010); § 736.0502, Fla. Stat. Moreover, if a trustee makes discretionary distributions, a creditor of a beneficiary may not "(a) [c]ompel a distribution that is subject to the trustee's discretion; or (b) [a]ttach or otherwise reach the interest, if any, which the beneficiary might

have as a result of the trustee's authority to make discretionary distributions to or for the benefit of the beneficiary." § 736.0504(2), Fla. Stat.

The undersigned has concluded that the Trust was created in 2011 as a valid irrevocable trust and that the transfer by Bellinger of approximately $1.7 million in assets to the Trust in 2012 was not a fraudulent transfer. And, a review of the Trust shows that it contains a valid spendthrift provision at Article V(A)(1). [DE 377-11, p. 27]. Additionally, it is undisputed that the Trust distributions are discretionary. Therefore, it would follow that BB&T cannot reach any interest or distribution of the Trust until Bellinger receives the interest or distribution. Once Bellinger receives the interest or distribution, BB&T may properly garnish or attach it. The question here is what happens when Bellinger takes action to have the Trustee direct Trust distributions to Donnelly, for the sole benefit of Bellinger.

In engaging in this analysis, it is clear that Bellinger requested that the Trustee make the monthly Trust distributions to Donnelly, instead of to himself, on or about May 8, 2013. That is, Bellinger requested that the Trustee pay to Donnelly the same amount of distributions it had been paying each month to Bellinger. The intent of Bellinger was to have Donnelly receive those distributions solely for his benefit. This was clearly an effort by Bellinger to divert his assets—his receipt of distributions from the Trust—away from BB&T's reach, yet also to keep them for his own benefit and support. These distributions were paid to Donnelly from May 8, 2013 until Bellinger requested that the Trustee stop the distributions on or about January 7, 2015. As Bellinger testified, the total amount of these distributions was approximately $305,000.00. But for Bellinger's direction to the Trustee, these Trust distributions would have been made to Bellinger and, once received by Bellinger, could have been applied to the Judgment that Plaintiff

held against Bellinger.  *See Wiand v. Lee*, 753 F. 3d 1194, 1203 (11th Cir. 2014).  In effect, Bellinger was using Donnelly as his proxy to continue receiving his Trust distributions.

Even though BB&T cannot reach the Trust corpus when it is held by the Trust, BB&T can reach the Trust distributions once they are received by Bellinger (or his proxy) for his benefit.  This is so because the broad definition of "transfer" includes every mode of disposing of an asset, and it is not limited to direct transactions made by the debtor.  *See Nationsbank, N.A. v. Coastal Utils., Inc.*, 814 So. 2d 1227, 1230 (Fla. 4th DCA 2002).  Florida courts' criterion for when something constitutes property of a debtor that is transferred is "property which could have been applicable to the payment of the debt due."  *Wiand*, 753 F. 3d at 1203.  Therefore, the payment of Trust distributions to Donnelly (solely for Bellinger's benefit) per Bellinger's request, instead of directly to Bellinger, was a "transfer" under the UFTA.  In effect, Bellinger requested and caused the diversion to Donnelly of the Trust distributions previously payable to him.  Bellinger also maintained a high level of control over Donnelly's Well Fargo bank account, as discussed elsewhere in this Report and Recommendation.  Based upon the evidence and the totality of circumstances surrounding the payment of Trust distributions to Bellinger, and then to Donnelly as his proxy, for Bellinger's benefit, the Court finds that those distributions, once received by Donnelly as Bellinger's proxy, were the property of Bellinger.  By requesting and causing the Trust distributions to be made to Donnelly, for Bellinger's benefit, instead of to himself, Bellinger effectively put those distributions out of the reach of BB&T but retained them for his benefit.  In doing so, he affected a transfer under section 726.102, Florida Statutes.

Although Bellinger does not have complete control over the Trust corpus, he does have limited control over the Trust distributions.  That is, he has the power to request that Trust distributions be made to a specified beneficiary in a specified amount, and he has the power to

request a change in Trust distributions, although the final decision is up to the Trustee.  Thus, the Court rejects Defendants' argument that because the initial creation of the Trust in 2011 and the funding of the Trust in 2012 was a not a fraudulent transfer, BB&T cannot obtain the distributions received by Bellinger through his proxy, Donnelly, for his benefit.  The finding by this Court that the funding of the Trust was not a fraudulent conveyance means that BB&T cannot garnish or attach the corpus of the Trust.  BB&T also cannot garnish or attach Trust distributions made to beneficiaries other than Bellinger unless those other beneficiaries are being used by Bellinger as his proxy and are receiving Trust distributions solely for the benefit of Bellinger.  However, this does not mean that BB&T cannot garnish or attach the Trust distributions once received by Bellinger or once received by Bellinger's proxy solely for Bellinger's benefit.

Donnelly also makes a second argument that the property in the Trust is exempt property under Cook Islands law and, therefore, the property does not constitute an "asset" that could have been applied to the Judgment under the UFTA.  [DE 311, p. 4].  According to section 726.102(2), an "asset" is property of a debtor, but the term does not include "property to the extent it is generally exempt under nonbankruptcy law."  Donnelly contends that under nonbankruptcy law, which she says includes the law of the Cook Islands, the Trust property is exempt property.  Donnelly argues that the Court must follow Cook Islands law in determining whether the assets in the Trust are exempt property because the law of the site of the property controls. *Id.*

However, the Court is not persuaded by this argument.  First, the Court's reasoning in the immediately preceding paragraphs as to Bellinger's use of Donnelly as his proxy to receive Trust distributions for his benefit applies to this argument as well.  Second, the distributions that were

made to Donnelly from the Trust from May 2013 through January 2015 were deposited into Donnelly's Wells Fargo account, located in Florida. Those distributions were being made to Bellinger until he requested that those distributions be made to Donnelly on or about May 8, 2013. It is undisputed that the distributions made to Donnelly's Wells Fargo account were for the benefit of Bellinger. The distributions, once distributed to Donnelly (Bellinger's proxy) from the Trust for the benefit of Bellinger, were no longer "property in the Trust." Therefore, the Court sees no reason to apply Cook Islands law when the distributions were received in Florida, in Donnelly's Wells Fargo account, for the benefit of Bellinger who resides in Florida. Instead, under the unique facts of this case, Florida law applies to such distributions from the Trust which were received in Florida and deposited into a Florida bank account for the benefit of a Florida debtor.

BB&T claims that several badges of fraud are present and establish that Bellinger had actual fraudulent intent when he requested that the Trust distributions be transferred from himself to Donnelly for his benefit. Indeed, the transfer was to an "insider." Section 726.102(8) defines "insider" as, among other things, a relative of the debtor. "Relative" is defined in section 726.102(13) as "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree." However, the "insider" badge has also been found where there are close, personal relationships between a debtor and transferee. *See In re McIver*, 177 B.R. 366, 370 (Bankr. N.D. Fla. 1995) (holding that a debtor's live-in girlfriend was an insider-in-fact); *In re Levy*, 185 B.R. 378, 384-85 (Bankr. S.D. Fla. 1995). Therefore, because Donnelly was Bellinger's live-in girlfriend, had known him since 1986, had worked for his company from 2006 through 2015, and had both a

personal and business relationship with him, Donnelly was an insider.  Moreover, as established

earlier, Bellinger had been sued before he requested the transfer of the distributions from himself

to Donnelly, to be held by Donnelly for Bellinger's benefit.

Once Bellinger caused the Trust to make distributions to Donnelly in May of 2013, for

his benefit, he did essentially retain control over the Trust distributions made to Donnelly's

Wells Fargo account.  As noted earlier, Bellinger had access to the online banking for Donnelly's

account, he had a debit card for Donnelly's account, he could withdraw money from Donnelly's

account, and he wrote checks on that account, which Donnelly would then sign.  Further,

Bellinger and Donnelly both testified that the account was purely set up to pay the living

expenses of Bellinger.  That is, the Trust distributions were being paid to Donnelly's account in

order to pay Bellinger's living expenses.  And, Bellinger did not receive any consideration from

Donnelly when he caused the Trust distributions to be transferred to Donnelly.

Finally, the transfer of distributions did occur near in time to when a substantial debt was

incurred.  Summary judgment was entered in favor of BB&T against Bellinger on April 29,

2013.  [DE 209].  The transfer of the Trust distributions to Donnelly began on or about May 8,

2013, and the Final Judgment against Bellinger was entered on May 28, 2013.  [DE 293, pp. 2,

3].

As there are multiple badges of fraud present, which BB&T has proven, a prima facie

case is established, and the burden shifts to Bellinger and Donnelly to show that the transfer was

not fraudulent.  Section 726.109(1) states that a transfer "is not voidable under [§] 726.105(1)(a)

against a person who took in good faith and for a reasonably equivalent value."  Donnelly and

Bellinger claim that Donnelly took in good faith and for reasonably equivalent value.  [DE 311,

pp. 5-6].

Courts apply an objective test to determine if a transferee has acted in good faith. *In re Berkman*, 517 B.R. 288, 303 (Bankr. M.D. Fla. 2014). The question is whether the transferee had either actual knowledge of the debtor's fraudulent purpose or knowledge of such facts or circumstances that would have caused a reasonable person to inquire further about the transferor's purpose. *Id.* The Court finds that Donnelly was a credible witness based on her demeanor and testimony. Donnelly had known Bellinger since 1986 and perceived him to be an honest man of the highest integrity. She testified that she did not believe Bellinger had a fraudulent purpose in making the transfers. There was also no evidence that Donnelly benefitted or profited from the transfer of Trust distributions to her, nor is there sufficient evidence to establish that she conspired with Bellinger to defraud BB&T. Although Donnelly knew of BB&T's lawsuit against Bellinger, she testified that she had no intention of helping Bellinger avoid BB&T; she just wanted to help Bellinger pay his everyday living expenses and avoid embarrassment.

According to Donnelly, she believed that any assets in the Trust were unreachable by Bellinger's creditors because they were exempt under Cook Islands law. Further, Donnelly did not expect that Bellinger would be personally liable for any monies owed to BB&T because the property securing the debt was valued at $15 million, Bellinger's co-guarantors had a combined net worth of over $100 million, Bellinger's co-guarantors had indemnified him from the BB&T claim, and the co-guarantors had discharged all of Bellinger's other contingent liabilities during the previous five years. [DE 367, p. 6]. The Court finds that Donnelly objectively and subjectively acted in good faith and without fraudulent intent in receiving the Trust distributions from on or about May 8, 2013 through on or about January 7, 2015. However, that does not end

the inquiry as the Court must determine whether Donnelly took the distributions for reasonably equivalent value.

As to the "reasonably equivalent value" element, Bellinger and Donnelly both argue that the distributions from the Trust were received by Donnelly for reasonably equivalent value because Donnelly was going to pay all of Bellinger's living expenses with the distributions. However, Donnelly and Bellinger both testified that Donnelly did not give any consideration to Bellinger at the time of the transfer when Bellinger directed the Trustee to make the distributions to her account.   Moreover, Section 726.104(1) states that "value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."   Here, Bellinger asked the Trustee to transfer the fixed monthly distributions that he was receiving from the Trust to Donnelly's Wells Fargo account on or about May 8, 2013 until on or about January 7, 2015.   Bellinger and Donnelly claim that Donnelly gave reasonably equivalent value for the transfer of distributions because she promised to pay Bellinger's living expenses with the distributions and did in fact pay those expenses with the distributions.   In other words, Donnelly promised to support Bellinger with the distributions from the Trust that would be made to her.   Donnelly testified that she indeed only used the distributions to pay the living expenses of Bellinger, except for her attorney's fees in this litigation, which Bellinger agreed to pay for from the Trust distributions.   Bellinger and Donnelly claim that Donnelly's promise to pay Bellinger's living expenses was performed and that the bank statements of Donnelly's Wells Fargo account prove that much.   *See* DEs 377-15, 377-16.

However, it is difficult for this Court to reconcile Donnelly's promise to pay support with section 726.104(1).   The term "unperformed promise" is not defined in the statute.   One question

35

is whether the term "unperformed promise" is referring to unperformed at the time the transfer was made or unperformed at the time the action is brought.  Florida's Fourth District Court of Appeal held that a son's promise to pay his father, the debtor, a certain amount of future royalties of an aeronautical invention was an unperformed promise because "there had been no sales of the invention, no projected sales and [the son] was a less than credible proponent of the invention's prospects for generating future revenue.  Moreover, distribution of the invention required FAA approval, which was, at best, uncertain." *Manchec v. Manchec*, 951 So. 2d 1026, 1029 (Fla. 2007).  Further, the court stated that "[t]he potential of future royalties was uncertain and unfixed, two qualities that render an 'unperformed promise' insufficient to qualify as 'value given for a transfer.'" *Id.*

Here, the undersigned finds that Donnelly's promise to support Bellinger was an unperformed promise in that, when Bellinger initially transferred the distributions of the Trust to Donnelly: (1) she had not yet paid for any of his living expenses; (2) the payment of his living expenses was uncertain because the Trustee had the discretion to deny any of the distributions; and (3) the payment of his living expenses was an unfixed amount because Donnelly's promise was just a general promise to support Bellinger whenever he needed it.  Therefore, Donnelly's promise to support Bellinger did not qualify as reasonably equivalent value.  The Court also finds that it would be against public policy to allow a debtor to cause Trust distributions to be paid to the debtor's proxy, for the debtor's benefit, in order to evade a creditor and then claim that when the debtor's proxy paid the debtor's living expenses, such payment or promise to pay constituted "reasonably equivalent value."  Accordingly, for all these reasons, the undersigned rejects this affirmative defense.

Donnelly also asserts the "mere conduit" affirmative defense. Donnelly claims that she "acted as a mere conduit of the funds from the [Trust] to the persons and entities she transferred the funds to." [DE 311, p. 8]. BB&T, however, correctly points out that the Eleventh Circuit has not yet addressed whether the affirmative defense of "mere conduit" applies in UFTA actions. *Perlman v. Bank of Am., N.A.*, 561 Fed. Appx. 810, 812-13 (11th Cir. 2014). This affirmative defense has only been applied by the Eleventh Circuit "in the context of banks receiving funds and depositing them into customer accounts." *Steinberg v. Barclay's Nominees (Branches), Ltd.*, 2008 WL 7601042, at *7-8 (S.D. Fla. Sept. 30, 2008). It does not appear that the Eleventh Circuit intended to apply this defense to an individual receiving funds and subsequently paying them to someone else or using them to pay someone else's living expenses. Moreover, in order to prove the affirmative defense of "mere conduit," the transferee must establish that he or she did not have control over the assets transferred. *Perlman*, 561 Fed. Appx. 813. Donnelly did not make this showing because she was the only person with signatory authority on the Wells Fargo account and did have joint control with Bellinger over the money while it was in her account. Thus, the undersigned also rejects this affirmative defense.

The Court therefore finds that BB&T did establish, by a preponderance of the evidence, that the transfer of Trust distributions from Bellinger to Donnelly and the payment of Trust distributions to Donnelly for the benefit of Bellinger from on or about May 8, 2013 through on or about January 7, 2015 constituted an actual fraudulent transfer by Bellinger.

With regard to constructive fraud under section 726.105(1)(b), as discussed above, Donnelly did not take the Trust distributions in exchange for reasonably equivalent value. That is, in exchange for Bellinger requesting that the distributions from the Trust go to Donnelly's account, it was not "reasonably equivalent value" for Donnelly to agree to pay all of Bellinger's

living expenses with the distributions. *See* § 726.104(1). Additionally, BB&T showed that Bellinger believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due when he caused the transfer of the distributions from the Trust to Donnelly for his benefit. Bellinger testified that the Trust distributions were his only income when he was receiving them. Because these distributions were Bellinger's only income, he reasonably should have believed that if he caused the transfer of the distributions to Donnelly then he would be unable to pay his debts as they became due. In fact, Bellinger did believe this; Bellinger testified that he and Donnelly set up Donnelly's Wells Fargo account in order to pay Bellinger's living expenses. Thus, BB&T did make a prima facie showing of constructive fraud for the transfer of the Trust distributions to Donnelly from May 2013 to January 2015.

However, as the Court has already found that BB&T established that the transfer of the Trust distributions from Bellinger to Donnelly was an actual fraudulent conveyance, and that Bellinger and Donnelly failed to prove their affirmative defenses, the Court need not readdress Bellinger and Donnelly's affirmative defenses to the extent they pertain to the constructive fraud claim. The analysis discussed above is incorporated herein. Accordingly, the undersigned finds that the transfer of Trust distributions from Bellinger to Donnelly and the payment of Trust distributions to Donnelly, for the benefit of Bellinger, from on or about May 8, 2013 through on or about January 7, 2015 also amounted to constructive fraud by Bellinger and constituted a fraudulent transfer.

**H. Relief to Which BB&T is Entitled**

In its Complaint in Proceedings Supplementary [DE 293], BB&T sought the primary relief of:

    1) A judgment finding that the Asset Transfer from 2013 to 2015 was a fraudulent

transfer;

2) A judgment ordering that the distributions of the Trust in the possession of Donnelly be applied to the Final Judgment;

3) An award of reasonable costs and attorney's fees to BB&T; and

4) An injunction preventing Donnelly from receiving further disbursements from the Trust.

[DE 293, p. 5, para. 24 and "Wherefore" clause].  The Complaint in Proceedings Supplementary also sought certain alternative relief, including the entry of a judgment against Bellinger and Donnelly for the value of the assets transferred, but the primary relief sought by BB&T was that recited above.  In subsequent hearings and memoranda, BB&T requested additional relief, such as a judgment against Bellinger and Donnelly, jointly and severally, in the approximate amount of $1.7 million, and certain other forms of relief not requested in its Complaint in Proceedings Supplementary.  [DE 371, p. 20; DE 387, p. 20].[10]

Since this Court has determined that Bellinger's 2011 creation of the Trust and 2012 transfer of assets to the Trust was not a fraudulent transfer, BB&T is not entitled to any relief against either Bellinger or Donnelly in regards to the 2011 creation of the Cook Islands Trust or the 2012 transfer of assets to the Trust.   However, since this Court has determined that

---

[10] Due to the Court's concerns as to whether it had jurisdiction to entertain the relief apparently sought by BB&T, the Court gave the parties an opportunity to file supplemental memoranda on the jurisdictional issues.  [DE 389].  The Court has carefully considered these memoranda, and the limits of its ancillary jurisdiction, in entering this Report and Recommendation. *See, e.g., Peacock v. Thomas*, 516 U.S. 349, 359 (1996) (ancillary jurisdiction does not extend to "a new lawsuit to impose liability for a judgment on a third party."); *Nat'l Mar. Servs., Inc.*, 979 F. Supp. 2d at 1327 ("The Court has ancillary jurisdiction over these supplemental proceedings as [the creditor] is seeking assets of the Judgment Debtor…that are found in the hands of a third party…"), *aff'd*, 776 F. 3d 783 (11th Cir. 2015) ("[T]he district court had ancillary jurisdiction over this supplementary proceeding because National Maritime sought to disgorge Straub of a fraudulently transferred asset, not to impose liability for a judgment on a third party."); *Reisck v. Universal Commc'ns of Miami, Inc.*, CASE NO. 15–20935–MC–ALTONAGA, 2015 WL 6561689, *5 (S.D. Fla. Aug. 18, 2015) (The court stated that the Eleventh Circuit affirmed in *National Maritime* because, by limiting the third party's liability to the proceeds the defendant fraudulently transferred to the third party, the plaintiff sought to disgorge the third party of a fraudulently transferred asset, not to impose liability for a judgment on a third party).

Bellinger's effort from 2013-2015 to have the Trust distributions transferred and paid to Donnelly (as his proxy) for his benefit was a fraudulent transfer, the Court will now address the appropriate relief to which BB&T is entitled.

As to Bellinger, BB&T argues that *Nat'l Mar. Servs., Inc. v. Straub*, 979 F. Supp. 2d 1322 (S.D. Fla. 2013), *aff'd*, 776 F. 3d 783 (11th Cir. 2015), allows this Court to enter an additional judgment against Bellinger. [DE 390, p. 5]. BB&T wants this Court, at a minimum, to enter a judgment against Bellinger in the amount of the $305,000.00 paid by the Trust to Donnelly for the benefit of Bellinger. *Id.* In *Straub*, the Southern District of Florida concluded, without discussion of imposition of an additional judgment, that final judgment should be entered "against Defendant, Burrell Shipping Company, LLC, and Impleaded Defendant, Glenn F. Straub, for the amount of the Final Judgment entered against Burrell Shipping Company, LLC." *Straub*, 979 F. Supp. 2d at 1330. Moreover, the district court stated that it had "ancillary jurisdiction over these supplemental proceedings as [the creditor] is seeking assets of the Judgment Debtor…that are found in the hands of a third party…", *Nat'l Mar. Servs., Inc.*, 979 F. Supp. 2d at 1327. On appeal, the Eleventh Circuit stated that the district court "entered judgment against Straub in the amount of the final judgment against Burrell Shipping." *Straub*, 776 F. 3d at 786. Moreover, the Eleventh Circuit concluded that "the judgment in favor of National Maritime and against Straub" would be affirmed. *Id.* at 789. The court did not mention a judgment against Burrell Shipping. Thus, *Straub* is not necessarily instructive for the proposition that this Court can enter an additional judgment against Bellinger.

The Court finds that BB&T is not entitled to another judgment against Bellinger for the approximate $305,000.00 in Trust distributions made to Donnelly from 2013-2015. As stated earlier, a fraudulent conveyance action is not a means for a creditor to obtain an additional

judgment against the debtor.  A fraudulent conveyance action is "either an action by a creditor against a transferee directed against a particular transaction…or it is an action against a transferee who has received an asset by means of a fraudulent conveyance and should be required to either return the asset or pay for the asset." *Yusem*, 770 So. 2d at 749.  It is not "an action against a debtor for failure to pay an amount owing from a prior judgment." *Id.* Therefore, BB&T is not entitled to another judgment against Bellinger for the amount of the Trust distributions transferred to Donnelly from 2013-2015.  BB&T already has its main Judgment against Bellinger.  A further judgment for $305,000.00 against Bellinger would be redundant, unnecessary, and not within the relief contemplated under Florida's fraudulent conveyance statute.

As to Donnelly, courts have ancillary jurisdiction in cases where a creditor institutes proceedings supplementary in order to recover assets that were fraudulently transferred to a third party.  *Straub*, 776 F. 3d 783, 788 (11th Cir. 2015).  As BB&T is seeking to recover the distributions that were fraudulently transferred to Donnelly, this Court has ancillary jurisdiction over her, and Donnelly's liability is limited to the proceeds that Bellinger fraudulently transferred to her Wells Fargo account from the Trust.  *Id.* at 787.  Bellinger testified that the amount of distributions transferred to Donnelly from May 2013 through January 2015 was approximately $305,000.00.  Therefore, the maximum amount that this Court has jurisdiction to hold Donnelly liable for is $305,000.00.  However, this situation is unique because, although the distributions were made to Donnelly, she spent nearly all of the money to pay Bellinger's living expenses.  The balance of the money was used to pay her attorney in this action, which indirectly benefitted Bellinger and guaranteed Donnelly due process.  Moreover, she did not profit at all from the Trust distributions and acted in good faith, without a corrupt motive.  Further, this is not

a situation where the asset transferred to Donnelly remains fully in her possession and can be returned.

In BB&T's Complaint in Proceedings Supplementary, BB&T specifically sought an order that "the distributions of the Trust in the possession of Maureen Donnelly" be applied to the Judgment. [DE 293, p. 5, "Wherefore" clause] (emphasis added). The Court should grant that specific primary relief requested by BB&T in its Complaint in Proceedings Supplementary, that is, Donnelly should be ordered to pay over to BB&T the distributions remaining in her possession that she received from the Trust from May 2013 through January 2015. The Court should not order that a judgment in the amount of $305,000.00 be entered against Donnelly. In this regard, it is clear that the remedies set forth for creditors in section 726.108, Florida Statutes, are equitable in nature. See § 726.108, Fla. Stat. The court is given broad discretion to fashion an appropriate remedy for the creditor. Taking this into consideration, the Court believes that, under the circumstances, it would be inequitable and unfair to enter a judgment against Donnelly in the amount of $305,000.00, as sought by BB&T. Donnelly did not profit from the Trust distributions, Donnelly paid the Trust distributions to Bellinger for his living expenses, care and sustenance, Donnelly acted in good faith without any intent to defraud BB&T, and Donnelly is unemployed and without sufficient assets to pay such a judgment. Moreover, the Court is concerned that entry of a judgment of $305,000.00 against Donnelly, under the specific facts of this case, may exceed this Court's ancillary jurisdiction.

Donnelly only received the distributions from approximately May 2013 to January 2015. The only benefit Donnelly actually received from the Trust distributions was the payment of her attorney's fees in this litigation, which was also in the best interests of Bellinger because if Donnelly prevailed then his transfer would not be fraudulent. Finally, almost all of the

distributions made to Donnelly's account have been paid out to Bellinger or to the attorneys in this litigation. She did not benefit at all from her receipt of the Trust distributions. Thus, Donnelly should only be required to pay to BB&T the amount of Trust distributions remaining in her possession, as sought by BB&T as its primary request for relief in its Complaint.[11] In other words, Donnelly should be ordered to pay to BB&T the remaining assets in her possession that were fraudulently transferred to her from the Trust between May 2013 and January 2015. *See Yusem*, 770 So. 2d at 749. Such relief is clearly appropriate under Florida's fraudulent conveyance statute.

Further, BB&T requested that Bellinger, not Donnelly, be held liable for its reasonable costs and attorney's fees incurred in these proceedings supplementary. *See* DE 293, p. 5; DE 371, p. 20; DE 390, p. 8. Section 56.29(11), Florida Statutes, provides that "[c]osts for proceedings supplementary shall be taxed against the defendant as well as all other incidental costs determined to be reasonable and just by the court," which includes reasonable attorney's fees. Florida courts have interpreted this section to mean that costs for proceedings supplementary can only be taxed against the judgment debtor and cannot be taxed against impleaded parties. *See Rosenfeld v. TPI Intern. Airways*, 630 So. 2d 1167, 1169 (Fla. 4th DCA 1993); *DuSoe v. Securis Int'l, Inc.*, 672 So.2d 89, 90 (Fla. 1st DCA 1996). In other words, BB&T would only be entitled to an award of costs and attorney's fees against Bellinger, the judgment debtor, and not against Donnelly, the impleaded party. Because Bellinger did engage in a fraudulent transfer as to the payment of the Trust distributions to Donnelly from 2013-2015, Bellinger is liable for BB&T's reasonable attorney's fees and costs incurred in seeking and obtaining that relief.

---

[11] There was no testimony at the evidentiary hearings on what amount remains in Donnelly's Wells Fargo account. However, according to the Wells Fargo account statement [DE 377-15, p. 84], as of January 7, 2015, there was $10,488.75 remaining in the account.

Finally, in Paragraph 24 of its Complaint, BB&T seeks an injunction preventing Donnelly from receiving further disbursements from the Trust. [DE 293, p. 5, para. 24]. The undersigned recommends that an injunction be entered preventing Donnelly from receiving any further distributions from the Trust, as Bellinger's proxy, for the sole benefit of Bellinger. That is, the Court should enjoin Bellinger from using Donnelly as his proxy to receive Trust distributions for his sole benefit. However, because Donnelly is a beneficiary under the Trust, and because the Trust was legitimately created, Donnelly is entitled to receive distributions from the Trust for her own benefit. It would be overbroad to enjoin Donnelly from receiving Trust distributions for her own benefit, but she should be enjoined from receiving Trust distributions as Bellinger's proxy, for the sole benefit of Bellinger.

## IV.    CONCLUSION

Based on the foregoing considerations, this Court **RECOMMENDS** that the Honorable United States District Judge Kenneth A. Marra **GRANT IN PART AND DENY IN PART** the Complaint in Proceedings Supplementary [DE 293], as follows:

1. BB&T's Complaint in Proceedings Supplementary [DE 293] should be **GRANTED** to the extent that it seeks to have the payment of the Trust distributions to Donnelly for the benefit of Bellinger from May 8, 2013 to January 7, 2015 deemed a fraudulent transfer under Florida law. Impleaded Defendant Donnelly should be ordered to pay over to BB&T all amounts remaining in her possession that were transferred to her from the Trust between May 2013 and January 2015. Defendant Bellinger should be ordered to pay BB&T's reasonable costs and attorney's fees which BB&T incurred in seeking to have the Trust distributions paid to Donnelly for Bellinger's benefit be deemed a fraudulent

conveyance.

2. An injunction should be **GRANTED** preventing Donnelly from receiving any further Trust distributions from the Trust as Bellinger's proxy for the sole benefit of Bellinger, and preventing Bellinger from taking any action to have the Trust distributions paid to Donnelly as his proxy for his sole benefit.

3. BB&T's Complaint in Proceedings Supplementary [DE 293] should be **DENIED** in all other respects.

## NOTICE OF RIGHT TO OBJECT

A party shall file written objections, if any, to this Report and Recommendation with United States District Judge Kenneth A. Marra within fourteen (14) days of being served with a copy of this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(C).

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 13th day of January, 2016.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE